Name: ARNOLD KEVIN BURT
Address: 3183 WILSHIRE BLVD.
STE. 196 D18
Phone: 510 909 1951
Fax:
In Pro Per

FILED
CLERK, U.S. DISTRICT COURT
SEP 27 2021
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

LACV21-7688-FLA-KESx

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARNOLD KEVIN BURT, Plaintiff | CASE NUMBER: |
| v. | CIVIL COMPLAINT |
| U.S. GOVERNMENT, Defendant(s). | (Enter document title in the space provided above) |

Arnold K. Burt

9/27/2021

Page Number



Marion S. Karvas
mkarvas@govtclaim.com
P.O. Box 340639
Austin, Texas 78734
(P) 512-266-7676
(F) 512-266-4646
www.govtclaim.com

August 13, 2018

MAILED VIA USPS
Arnold Kevin Burt
5671 Riverside Drive
Room #143
Ferndale, WA 98249

RE: Administrative Claims Under the Federal Tort Claims Act of Arnold Kevin Burt, Individually

Dear Kevin:

**Please take a moment to read and review this letter and the entire packet contents.**

Thank you for selecting the Archuleta Law Firm. Michael Archuleta, M.D., J.D. will be the attorney overseeing your administrative claims. We are here to answer any questions and rest assured you'll be working with an experienced team. The office hours are Monday through Friday 9 a.m. to 4:00 p.m. central time. My email address is mkarvas@govtclaim.com. Feel free to contact me at 512.266.7676 or by email with any questions. Please keep this letter for future reference and contact information.

Enclosed are several documents for you to review and sign. Before presenting an administrative claim under the Federal Tort Claims Act, these documents must be completed, signed and dated. The forms were completed based on the initial information provided to this firm. The documents must be returned to this firm promptly by **Monday August 27, 2018**. If any data is inaccurate or incomplete please contact the firm immediately.

The Form 95 along with the *Claim for Damages* and exhibits are the documents initially presented to the Government. Upon receipt of the enclosed documents signed and dated you will then be mailed the Form 95 and a copy of the *Claim for Damages* for your review. The Form 95 requires your signature and date. After reviewing the *Claim for Damages* we appreciate any feedback if there are omissions or corrections as to the claim facts. We make every attempt to incorporate your feedback if we determine it adds merit or requires a revision. If I do not receive feedback within two business days after receipt, we will present the Form 95 and documentation.

To protect the interest of our client(s), we must list a much larger amount on the Form 95's than what is expected to be recovered. The total value listed in Section 12(d) "Amount of Claim" is not the amount the firm expects to receive as financial compensation or judgment in this claim. Federal law requires the firm to claim a total amount of damages, which becomes the maximum amount expected to recover in this claim. It is difficult to value the total damages early in a case, or unexpected events may result in increased damages. Most states have a limit on the maximum amount awarded for non-economic damages.

If for any reason you were/are contacted by the Government, either verbally or in writing, as it relates to this FTCA claim please notify the law firm immediately and we will address their requests appropriately.

We ask that you complete the questionnaire to the best of your ability. The questionnaire and evidence documents should be returned with the Form 95's, letter of representation and the attorney retainer agreement. The questionnaire and documents supports the Form 95's by establishing the basis of the claim and prepares the firm to respond to the Government's request supporting economic (if applicable) and non-economic damages.

The Government requests supplemental evidence information within 30 days of receipt of the Form 95's. The firm takes a proactive position by requesting you return the requested information and documents as listed in the evidence checklist as quickly as possible in preparation of their demands.

Enclosed you will find an envelope requiring postage to return the following documents:

1. Standard Form 95s
2. Two Medical Authorization Forms
3. Client Questionnaire with accompanying documents
4. **All medical records as it relates to ongoing treatment for the injury**

If you wish to use a courier service other than the USPS, our physical address is:

The Archuleta Law Firm, 1100 Lakeway Drive, Suite 101, Austin, Texas 78734.

The law firm requests your assistance in managing your claim. By that we mean it is imperative you provide us with any and all medical records as it relates to the injury or incident, even as you continue to receive medical care as it relates to this incident. Do not write or highlight on any records submitted to the firm.

Please notify the firm of any changes as it relates to your address or phone numbers and respond as quickly as possible when providing requested information or documentation.

The firm recommends you make a copy of all documents for your records. If you are unable to do so, please include a note with the return package and we will provide one to you.

**Important Notifications**

- Under the Federal Tort Claims Act (FTCA), an individual(s) or their representative must first file a claim with the federal agency responsible for the alleged misconduct. During this phase of the process, while the claim(s) is being reviewed by the federal agency, it is referred to as an "administrative claim." The claim has not been filed in Federal court nor referred to as a lawsuit.

- The Government attorney is under NO obligation to provide this law firm a status, update or reveal how and why they reached a final decision regarding the claims presented. There is actually no time limit for the Government to render a decision on FTCA claims. It is not uncommon for the Government to take longer than six months to respond, in fact, the average response time is 14 to 18 months. Under the Federal Tort Claims Act, 28 U.S.C §§ 1346(b) and 2671-2680, the Government has six (6) months to consider a claim before a claimant can opt to file a lawsuit in U.S. District Federal Court to be ruled on by a Federal judge 28 U.S.C. §2675.

- VA health care provider(s) may not be covered by the FTCA if they are not an employee of the Department of Veterans Affairs but instead a contract employee. This law firm cannot state which health care providers are or are not covered by the FTCA until we make a written Freedom of Information Act request. This law firm only represents you regarding the acts and omissions of negligent parties that are covered under the FTCA. If this law firm learns that any potentially negligent party is not covered under the FTCA, then we will notify you accordingly.

- The firm must prove economic and non-economic damages supporting the amount listed on the Form 95 and these damages, especially, economic, must be verified by documentation. Documentation for loss of wages from either an employer or self-employment must come in the form of W-2's or 1099's. If any spouse and/or child (minor or adult) claims loss of income as a result of the injury, documentation proving the injured individual consistently, financially contributed to the spouse/children. This documentation can be bank statements, receipts, or Social Security and/or Service Connected Disability annual statements.

- A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of denial of the claim by the agency to which it was presented. We make every attempt to present claims within the Statute of Limitations determined by medical evidence however; we have no way of knowing if the Federal agency will accept this date as actual. Additionally, each state has a Statute of Repose time period that bars presenting claims based on the date of action, even if an injury is not yet known. A tort claim must also be filed within this time period or it shall be forever barred.

- If the claimant received any treatment resulting from this injury by either Medicare or Medicaid the claimant(s) have an obligation to reimburse Medicare or Medicaid for payments made for such treatment if there is financial compensation by means of a settlement. Any Medicare/Medicaid activity will be processed through the firm.

- If the Government awards financial compensation by means of a settlement, all claimant(s) listed on the settlement agreement will have their taxpayer identification number (social security number) processed though the **Treasury Offset Program** (TOP) to determine if any claimant(s) have an existing federal or state lien/debt. If a lien/debt is identified, it is that claimant's responsibility to resolve such lien/debt or the Treasury Department will automatically deduct this lien/debt from the settlement amount. Each claimant may call **1-800-304-3107** to determine if a lien/debt exists under their name.

- If any individual elects not to participate in presenting a Federal Tort Claims Act claim to the Government on their behalf then please notify this firm immediately and a waiver, in lieu of, a Form 95 will be issued for review, signature and notarized.

- If you received treatment at a non-VA health care facility for this injury any expenses you incur will be applied towards economic damages – only if documentation is made available. Any and all expenses as it relates to non-VA care are the responsibility of the injured individual to resolve regardless of the outcome of the FTCA claim. It is not the responsibility of the Archuleta Law Firm to resolve this matter on your behalf.

- Please be advised the Government may stipulate offsetting awarded Section 1151 or Dependency Indemnity Compensation benefits if paid for the same injury to which a monetary recovery was made by way of a Federal Tort Claims Act claim.

After the claim is presented and accepted by the Government, the firm will contact you if the Government attorney provides any new information. Otherwise, please feel free to check in at any time but be advised we may not any new information. <u>Please understand the Governments' administrative FTCA process takes time, averaging between 12 to 18 months, before a decision is rendered at the Regional counsel level – so please be patient</u>.

In closure, please remember the Federal Tort Claim Act claims are presented to the Government and they are responsible to acknowledge, investigate, evaluate the claim and render an acceptance or denial. We will stay in contact with the Government attorney once your case is assigned and will provide you updates as your claim develops.

Sincerely,

Marion S. Karvas

Marion S. Karvas
Administrative Legal Assistant

**CONTINUATION PAGE**
**CLAIM FOR DAMAGE, INJURY, OR DEATH**

**#2 NAME, ADDRESS OF CLAIMANTS AND CLAIMANTS' PERSONAL REPRESENTATIVE, IF ANY:**

Claimants' Personal Representative
Michael Archuleta (Attorney for Claimants)
Michael Archuleta, II (Attorney for Claimants)
Archuleta Law Firm
P.O. Box 340639
Austin, Texas 78734
Telephone (512) 266-7676
Telefax (512) 266-4646

**#6 DATE AND DAY OF ACCIDENT AND #7 TIME:**

This claim concerns the substandard medical care provided by agents, servants, and employees of the United States at the Seattle VA Medical Center in Seattle, Washington to Arnold Kevin Burt starting on July 10, 2017 when Mr. Burt's new VA Primary Care Provider (PCP) discontinued his digoxin which he had been taking since 2008 when he was diagnosed with congestive heart failure (CHF). The discontinuation of digoxin lead to progressive CHF. By the time the error was discovered and the digoxin was reordered on June 10, 2018, Mr. Burt's heart was severely damaged. He is currently undergoing aggressive treatment by a specialist in an attempt to improve his heart function. However, a heart transplant may be required.

**#8 BASIS OF CLAIM:**

This claim concerns the substandard medical care provided to Arnold Kevin Burt, age 57, by the Seattle VAMC including, but not limited to negligent discontinuation of a vital heart medication, digoxin leading to end stage congestive heart failure. Mr. Burt had been on digoxin since 2008 when his ejection fraction was <15%. Through compliance with medications, strict diet, and exercise, Mr. Burt's ejection fraction improved to 30-35% in 2011 and 40-45% by December 2013. His heart disease remained stable for the next several years and he was asymptomatic until his new PCP discontinued the digoxin on 7/10/17. No cardiac testing was performed and no Cardiology Consult was ordered. Therefore, a recommendation from a qualified physician experienced in treating heart diseases was not obtained prior to discontinuing the digoxin. Additionally, despite Mr. Burt's history of CHF, he was not followed by VA Cardiology Clinic. Approximately 10 months after discontinuing the digoxin, Mr. Burt began developing symptoms of CHF with pulmonary edema, lower extremity edema, weight gain, lethargy, and erectile dysfunction. An ECHO performed on 6/20/18 revealed an ejection fraction

of 15-20% with significant heart abnormalities. Despite the digoxin re-started, severe heart damage had occurred. Mr. Burt was diagnosed with acute CHF and a heart transplant has been discussed if his heart function does not improve with aggressive therapy.

In August 2008, Mr. Burt was diagnosed with Class III CHF at NIH Bethesda, MD. Prior to the diagnosis, he had suffered a heart attack due to coronary artery stenosis and required a stent. Mr. Burt was prescribed digoxin, carvedilol, and Lisinopril to treat his CHF. Mr. Burt, who was 48 at the time, realized that he needed to significantly change his life style. He worked extremely hard with his diet making sure to eat heart healthy foods and exercised. He also was vigilant about taking all his prescribed heart medications. Within a year, Mr. Burt saw significant changes as his heart gradually became stronger with resolution of symptoms and improvement in his heart function evidenced by increased ejection fraction.

On 12/12/13, Mr. Burt was seen by Denise Van Ostaeyen, Cardiology NP at the Portland VAMC. His ejection fraction had improved to 45% and he was discharged from the CHF Cardiac Clinic. The note stated, "52 yr old with CHF, CAD, DM, HIV here for evaluation of CHF. Mr. Burt reports that he was first diagnosed with CHF in 2008. He has been followed at multiple VA hospitals in the past. He is currently homeless and living out of his car with his dog. He reports that his breathing is good. He can walk his dog several blocks without dyspnea (shortness of breath), but if he walks at a fast pace he sometimes feels short of breath. He denies chest pain, PND, orthopnea or lower extremity edema." ***See* Exhibit 1, Cardiology Outpatient Note 12/12/2013.** PMH included, "CHF: **Echo 9/9/2011** at Washington DC VA; Mildly dilated LV; Moderate to severely reduced LV function, EF 30-35%; Wall motion abnormalities in the LAD distribution. **Echo 12/4/2013**: EF 40-45%-Normal LV chamber size with **moderately reduced LV systolic function** that is segmental; No previous study available for comparison." ***Id.*** Active Medications for Mr. Burt included, "Lisinopril 5mg tab take one-half tablet by mouth every day for blood pressure; Carvedilol 12.5mg lab take one tablet by mouth twice a day; and **Digoxin** (lanoxin) 0.125mg tab take one tablet by mouth every day." ***Id.*** On the same day, Dec. 12, 2013 at 11:14, Mr. Burt's NT-proBNP was only slightly elevated at "134" with Reference Range: <125." ***Id.*** NT-proBNP are substances that detect and evaluate heart failure as they are produced in the heart and are released when the heart is stretched and working hard to pump blood. The Assessment/Plan stated, "52 yr old with CHF, CAD, DM, HIV here for evaluation of CHF. Mr. Burt is euvolemic on exam and on no diuretic. He has **stable CHF symptoms** with a **BNP of 134**. His **echo on 12/4 showed an EF of 40-45%**, so he is not an ICD candidate. He is on maximum tolerated doses of Lisinopril and metoprolol, so no further up titration is needed. **He is stable on good medical therapy**, so does not need further follow-up in the CHF clinic. Reinforced low sodium diet and signs/symptoms of worsening CHF. **Continue medications as above**. Follow-up with PCP." ***Id.*** Mr. Burt was thrilled that his hard work had paid off and his heart disease had improved so significantly, he no longer required follow-up for CHF.

Mr. Burt was retired and enjoyed traveling and the outdoors. He spent the next three and a half years traveling around with his dog and camping in RV Parks.

During the summer of 2017, he settled in Seattle. He was seen on 7/10/17 by Laxminarsimha Reddy, MD, his new assigned PCP. The note stated, "Mr. Burt is a pleasant 56 yo gentlemen with Stage 3 HIV (well controlled with good immune reconstitution on Atriple, ischemic cardiomyopathy (EF now 40% with nadir of 15%), diet controlled diabetes and MST related PTSD who presents to establish care and determine housing options." ***See*** **Exhibit 2, Primary Care Note 7/10/2017.** History of Present Illness stated, "With regards to his health, he is generally doing well. Shares with me his medical history which is recorded in the problem list. **Developed ischemic cardiomyopathy with EF nadir of 15%**, but was able to avoid ICD through use of medication and healthier living, with **most recent EF 40-45%.** No chest pains, orthopnea, dyspnea on exertion. **Notably is on digoxin still,** though I am unable to determine why based on records so far." ***Id.*** Exam stated, "Generally well appearing man in NAD; rrr without mrg; No jvd or LE edema appreciated. Assessment / Plan stated, "CHF: will peruse chart more thoroughly. **If I cannot find a clear reason for the ongoing digoxin, I would prefer that he stop using it** and will discuss this further at next visit." ***Id.*** Dr. Reddy added a Supplement stating, "Active Problems: Human immunodeficiency virus; Tuberculosis infection latent; Hyperlipidemia; Coronary artery disease; Heart failure -2008: EF of <15%, by 2013 **on meds** EF improved to 40-45%; Diabetes mellitus type 2; Posttraumatic stress disorder." ***Id.*** Despite Dr. Reddy documenting Mr. Burt's EF had improved from <15% to 40-45% ON MEDS and his CHF was stable, he discontinued one of his vital heart medications without consulting Cardiology. Although Mr. Burt questioned Dr. Reddy about the discontinuation of the digoxin, Dr. Reddy reassured him that he did not need the medication anymore. Mr. Burt had not choice as Dr. Reddy discontinued the order for digoxin.

Mr. Burt's Active Outpatient Medications related to his heart were listed as, "Aspirin 81mg EC tab take one tablet by mouth every day to reduce risk of heart attack or stroke, Carvedilol 12.5mg tab take one tablet by mouth twice a day for heart failure and blood pressure, and Lisinopril 2.5mg tab take one tablet by mouth every day for blood pressure." ***See*** **Exhibit 3, Medications 1/12/2018.**

Approximately **7** months after Dr. Reddy discontinued the digoxin, Mr. Burt was seen on 2/26/18 by an outside physician, John W. Tilley MD, at Unity Care NW. The note stated, "Reason for office visit: Establish care with PCP." ***See*** **Exhibit 4, Office Visit 2/26/2018.** Information under Problems included, "He has a history of CAD and CHF. He is status post stent for 90% LAD in 2008. **Congestive Heart Failure**-He **converted from Class III CHF to normal ejection fraction** before it was about to have an implantable defibrillator." ***Id.***

Patient Instructions included, "Physical Therapy/Chiropractic, **Cardiology**, Dental and Podiatry referrals have been ordered." ***Id.*** Dr. Tilley ordered a Cardiology Consult from Peyman Soltani, MD with PeaceHealth Cardiology.

Mr. Burt also requested a Cardiology Consult through the Seattle VA. On 4/12/18, Nicole A. Garcia documented a Choice request. The note stated, "Category of Care/Type of Specialty: Community Care-Cardiology. Type of Service/Procedure: Provisional Diagnosis: Atherosclerotic Heart Disease of Native Coronary Artery without Angina Pectoris. Reason for request: CAD (coronary artery disease), coronary stent, CHF." ***Id.***

Unfortunately, before a Cardiology Consult could be scheduled, Mr. Burt presented on 5/17/18 at Peace Health – St. Joseph Emergency Department with severe shortness of breath and edema. Mr. Burt was diagnosed with CHF exacerbation. The Discharge report stated, "Diagnoses this visit: Congestive heart failure, unspecified HF Chronicity, Unspecified Heart failure type (HCC)…START taking these medications: Furosemide (Lasix) 20 MG tablet – Take 1 tablet (20 mg) by mouth daily; Potassium Chloride 2- MEQ CR Tablet – Take 1 tablet (20 mEq total) by mouth daily. Take with food. ASK your doctor about these medications: Carvedilol Oral; Lisinopril Oral." ***Id.***

Five days later on 5/22/18, Mr. Burt contacted the Seattle VA to inform them of his CHF exacerbation. The note was written by Roberts, John W. with Receipt Acknowledged By: Brian H. Hopps, RN – Primary Care Clinic Registered Nurse. The note stated, "Comments: Veteran requests call back to **discuss his heart meds**. He is having **symptoms** of **congestive heart failure**." ***See*** **Exhibit 7, Administrative Note 5/22/2018.**

An Addendum the same day by Brian H. Hopps, RN – Primary Care Clinic Registered Nurse stated, "Patient called to report he was seen last weekend for CHF at Peace Health in Bellingham ER. Diagnosis: **CHF**; ER xl night; Treated with IV Lasix. Discharged: Prescribed 10 tablets Lasix and follow-up with cardiologist…He called because he **attributes onset of CHF symptoms** to **cessation of digoxin** when saw **Dr. Reddy in 7/2017**." ***Id.***

The following month on 6/20/18, Mr. Burt presented for an appointment with the outside Cardiologist, Peyman Soltani, MD at Bellingham, WA – St. Joseph Medical Center. The note stated, "Chief Complaint: Patient presents with: New patient exam; Congestive heart failure." ***See*** **Exhibit 8, PeaceHealth Cardiology 6/20/2018.** History of Present Illness stated, "Arnold K Burt is a 57 y.o. male with history of one pack of cigarette smoking since age 14. The patient quit smoking 5 years ago…He was told that he had a **congestive heart failure** with **decreased ejection fraction**. He claims that he was **on digoxin** and was **doing fairly well** up until late 04/2018, where he was **taken off the digoxin** by his **primary care physician**. Back in 05/2018

he presented to the hospital with a complaint of feeling short of breath, and gurgling sound in his lungs. He received IV Lasix and discharged home. Since then, he has been complaining of shortness of breath with more than mild activity. He denies chest pain. He complained of shortness of breath when lying flat at times. He denies PND, near syncope, syncope, palpitation or fever or chills. He has intermittent leg swelling." ***Id.*** Outpatient Prescriptions Marked as Taking for the 6/20/18 encounter included, "Aspirin 81 MG enteric coated tablet; Carvedilol Oral; Furosemide (Lasix 20 MG tablet); Lisinopril Oral; and Potassium chloride." ***Id.*** Impression stated, "**Congestive heart failure**." ***Id.*** Plan by Dr. Soltani stated, "He is complaining of heart failure symptoms and shortness of breath on exertion as well as orthopnea at times. He is euvolemic on exam currently. I will increase his Lasix from 20 mg once a day to twice a day to see if that makes him better in terms of shortness of breath as at times he might get volume overloaded. I will check his BMP in week. I will get a **2D echocardiogram** to assess his ejection fraction, wall motion valvular function. Depends on his ejection fraction in the presence of wall motion abnormality, we will consider further cardiac ischemic workup." ***Id.***

The same day, 6/20/2018, Mr. Burt underwent the ECHO. Dr. Soltani interpreted the study himself. The results showed a significantly decreased ejection fraction and heart abnormalities. Conclusions of the sturdy stated, "Left ventricular ejection fraction is **15-20%**; **Severe global left ventricular systolic dysfunction**. Normal left ventricle wall thickness. The left ventricle is mildly dilated. The right ventricle is dilated. The **right ventricle is moderately hypokinetic**. There is moderate bi-Atrial enlargement. Mild to moderate mitral regurgitation is present. Mild tricuspid regurgitation is present. Estimated pulmonary artery pressure is mildly elevated. Peak estimated pulmonary artery pressure is 44 mmHg. Trace (physiologic) pulmonic insufficiency is present." ***See*** **Exhibit 8, Echocardiogram Complete Doppler and Color Flow-PeaceHealth Medical Group-Cardiology 6/20/2016.**

An EKG also showed significant abnormalities. The study stated, "Normal sinus rhythm; Possible Left atrial enlargement; Low voltage QRS, consider pulmonary disease, pericardial effusion, or normal variant; T wave abnormality, consider lateral ischemia; Prolonged QT interval. Abnormal ECG." ***See*** **Exhibit 10, ECG Chart 06/20/2018.**

Two days later on 6/22/18, Mr. Burt was seen for follow-up by Dr. Soltani. Mr. Burt was informed of his acute CHF and was started back on digoxin. The note stated, "Current Diagnosis: Congestive Heart failure, unspecified HF chronicity, unspecified heart failure type (HCC). Patient presents with-Congestive heart failure." ***See*** **Exhibit 11, PeaceHealth Cardiology 6/22/2018.** History of Present Illness stated, "Mr. Burt is a 57-year-old gentleman with diabetes, HIV, currently undetectable virus, currently on antiviral medication, myocardial infarction in 09/2007 with LAD stenting in Northern Virginia. His previous ejection fraction was around 30% back in 01/2009 based on the report provided from the NIH Institute. He was fairly well. He

claims back in 04/2018, his **digoxin was discontinued by his primary physician**. Since then, he has been feeling short of breath. He had ER admission back in 05/2018. He was treated with IV Lasix and discharged home. I saw him last back on 06/20/2018. I increased his Lasix from 20 mg once a day to twice a day. He has been diuresing better. He felt better from shortness of breath at this time, but still has some residual shortness of breath on moderate to severe activity. He denied chest pain. He has shortness of breath if he lies completely flat for quite amount of time…His echocardiogram on 06/20/2018 showed **ejection fraction of 15% to 20%**. The right ventricle was moderately hypokinetic. His estimated pulmonary artery systolic pressure was 44 mmHg." ***Id.*** Impression stated, "**Acute on chronic congestive heart failure**, **systolic dysfunction**." ***Id.*** Plan included, "He clearly has **elements** and **symptoms** of the **heart failure** with his **deteriorating left ventricular systolic function**. The differential for his LV systolic dysfunction could be ischemic versus nonischemic such as HIV and diabetes. Given his established coronary artery disease and stent and deteriorating left ventricular systolic function, I will proceed with a left and right heart catheterization to delineate coronary anatomy as well as assess his pulmonary pressure, which will be elevated on echocardiogram. He understands and agreeable with the plan of care. We will schedule this for 07/06/2018. Meanwhile, we will increase his Lasix to 40 mg in the morning and 20 mg at night for 4 days and after that he can go back on Lasix 20 mg p.o. b.i.d. I would like him to get a BMP today…**In order to enhance his left ventricle contractility and improve his heart failure symptoms, I will start him back on a Digoxin 0.125 mg p.o. daily**." ***Id.***

The cardiac catheterization confirmed coronary artery disease was not the cause of Mr. Burt's acute CHF. However, the results of the cath confirmed elevated right heart pressures consistent with pressure and volume overload as well as decreased cardiac output and index. An additional note by Dr. Soltani stated, "Since the cardiac catheterization is complete and we obtained his right heart pressures and ruled out obstructive coronary artery disease, we will **refer him** to **heart failure specialist, Dr. Liu**." ***Id.*** Mr. Burt is currently being treated by Rex C. Liu, MD at Cardiovascular Center North Cascade Cardiology in an attempt to improve his heart function. However, an implantable cardiac defibrillator and/or heart transplant are being discussed due to Mr. Burt's poor heart functioning and high risk for sudden cardiac death.

Research has proven the numerous benefits digoxin has for patients with congestive heart failure. "With digitalis the LV function curve is moved upward and to the left. As a result, LV end-diastolic pressure and LV end-diastolic and end-systolic volumes are reduced, and there is an **increase of LV ejection fraction (LVEF)**.(1) In patients in HF, the multiple actions of digitalis are: Positive inotropic; Slowing of rapid ventricular rate; Vasodilation; Increasing baroreceptor sensitivity; Reducing plasma neurohormones; Increasing vagal tone; and Diuresis." ***See* Exhibit 12, Shahbudin H. Rahimtoola, MB, FRCP, DSc, *Digitalis Therapy for Patients in Clinical Heart Failure*; Circulation. 2004;109:2942-2946.** "Digoxin slows the ventricular

rate (1) in sinus rhythm because of an improvement in HF and withdrawal of sympathetic stimulation…The combination of digoxin and carvedilol is superior to digoxin or carvedilol alone.(2)" ***Id.*** Digoxin produces vasodilation of blood vessels. "The seminal study of Mason and Braunwald (3) showed that in HF, Digitalis produces an increase of blood flow, a decrease of vascular resistance, venodilation, and a decrease of central venous pressure and heart rate (Figure 1). The vasodilation is the result of an increase in cardiac output and direct baroreflex mediated withdrawal of sympathetic vasoconstriction. The reduction of systemic vascular resistance in patients in HF has been repeatedly confirmed."(1) ***Id.*** Digoxin improves coronary circulation. "Digitalis normalizes the blunted baroreflex mechanisms present in HF(4)…In HF, digitalis therapy has been shown to reduce plasma norepinephrine levels, serum aldosterone, and plasma renin activity, which has been repeatedly documented.(1) Digoxin induces diuresis in patients with HF who have fluid retention.(1) The mechanism (s) are multiple: vasodilation and increased CO (cardiac output) improves renal hemodynamics; inhibition of tubular reabsorption of sodium, of renal Na+, K+, ATPase, and of concentrating and diluting ability; and increased secretion of atrial natriuretic peptide." ***Id.***

There have been 16 small, randomized trials (5–22) and 8 nonrandomized studies that were reviewed previously.(1) In brief, these have documented **symptomatic improvement**, **improved HF score**, **increased exercise capacity** and VO2, **improved hemodynamics at rest and on exercise**, **increased LVEF at rest and on exercise**, **reduction of heart rate**, and other beneficial effects (Table 1). In each study, only a few parameters were measured. LV function from one study (Figure 2) shows that at rest and on exercise, when **digoxin is added** to diuretics or to diuretics and ACE inhibitors (ACE-I), the LV is functioning at a lower left atrial pressure but has an increased cardiac output, which is the hemodynamic explanation for the improvement in symptoms, exercise capacity, and **reduction of worsening HF with digoxin**." ***Id.***

Data from 12 randomized trials had shown that the incidence of **worsening HF** in the **non-digitalis group** was **24%** and in the **digitalis group** was **5%.**(1) Two of these small trials are described in further detail. Patients were in New York Heart Association functional classes II and III and had LVEF <0.35. Both of these were digoxin discontinuation trials. The Prospective Randomized study Of Ventricular failure and the Efficacy of Digoxin (PROVED) trial(21) was a comparison of digoxin and diuretics **versus** diuretics…In the PROVED trial, the **digoxin group** had a **lower incidence of worsening HF** and of **hospitalization for HF**, lower BUN and creatinine levels, a **higher LVEF**, and **better exercise capacity**, which was documented objectively. The Randomized Assessment of Digoxin on Inhibitors of the ANgiotensin Converting Enzyme (RADIANCE) trial22 was a comparison of digoxin, diuretics, and ACE-I **versus** diuretics plus an ACE-I. y. In the RADIANCE trial, the **digoxin group** had a **lower incidence of worsening HF** and a **better LVEF**, **quality of life**, and **exercise capacity**, which was documented objectively. Further analysis from the PROVED and RADIANCE trials have

shown the following important additional information: (1) Use of **digoxin therapy** in patients with **stable HF** would result in net annual savings of $406 million, with a 90% range of probability of $106 to $822 million.23 (2) The efficacy of 3 levels of serum digoxin concentration (SDC) of 0.5 to 0.9 mg/mL, 0.9 to 1.2 ng/mL, and >1.2 ng/mL with regard to LVEF and patient outcomes_were evaluated.24 **LVEF fell in patients assigned not to receive digoxin** and **increased** in those who **received digoxin** (*P*_0.0001); **treadmill times** were **reduced** in those **not receiving digoxin** and were unchanged in those receiving digoxin (*P*_0.0001). Multivariate Cox analysis demonstrated that the **risk of worsening HF** was **significantly less** for all 3 subgroups of **patients who continued to receive digoxin** after adjustment for LVEF, cardiothoracic ratio, age, HF score, and ACE-I use (Figure 3). There was no relation between SDC levels and changes in LVEF, treadmill times, and development of worsening HF. The incidence of **worsening HF** in the **placebo group** was **30%** and in the **3 digoxin subgroups was 6%, 9%, and 12%,** respectively (*P*_0.02 for no digoxin versus the digoxin subgroups)." ***Id.***

The Digitalis Investigation Group (DIG) trial is the largest trial of digitalis. It had two parts: the main trial and the ancillary trial. In the main trial, 6800 patients with **LVEF >0.45** were randomly assigned to digoxin **or** placebo: The **placebo group** received diuretics (82%) **and** ACE-I (95%) and the **digoxin group** received digoxin, diuretics (81%), **and** ACE-I (94%). The main findings were that **digoxin**: Had no effect on total mortality rates; **Reduced incidence** of **Death or hospitalization** caused by worsening HF, Hospitalization for worsening HF, and Death caused by worsening HF. In the ancillary trial, 988 patients with **LVEF >0.45** were randomly assigned to digoxin or placebo. It showed-**Death or hospitalization** for **worsening HF** was **lower** in patients assigned to **digoxin** and 'were consistent with the findings of the main trial.'(25) In patients with HF and normal LVEF (>0.50), there are virtually no good studies documenting that digitalis therapy is not of value. On the other hand, there are data to show that: In people with normal heart and in those with coronary artery disease but with normal LVEF,(1) digitalis-**Increases myocardial contractility**(1); **Moves LV function curve upward and to the left**(1); **Reduces LV end-diastolic and end-systolic volumes**(1). The Ancillary part of the DIG trial(25) showed that in those with HF and LVEF >0.45, the **incidence of death or hospitalization for worsening HF was reduced** and was consistent with the findings in the main trial. **Digitalis attenuates sympathetic nerve activity**, and this precedes the hemodynamic effects.(1,4)." ***Id.***

The American College of Cardiology/American Heart Association Guidelines for Chronic Heart Failure **gives digitalis therapy for clinical HF a class 1 grading** (that is, conditions for which there is evidence and/or general agreement that a given procedure/therapy is useful and effective) and **gives level of evidence an A classification** (that is, the data were derived from multiple randomized clinical trials).(28) **Recommendation** by American College

of Cardiology/American Heart Association states, "Digitalis was recommended for the treatment of symptoms of HF unless contraindicated. In other words, **all patients with clinical HF (that is, those in NYHA functional classes II-IV) and LV systolic dysfunction should receive digitalis**, unless contraindicated." ***Id.***

Advantages of Digitalis Therapy in Clinical HF include, "Stood test of time (in use 228 years); Given orally, once a day; Easily tolerated; Side effects infrequent; Has multiple actions: all mild; Has multiple beneficial clinical effects (Table 1); Inexpensive; Reduces costs of treating heart failure." ***Id.***

U.S. Government health care providers were negligent for discontinuing a heart medication, digoxin, Mr. Burt had been taking for approximately 10 years due to CHF. Mr. Burt was diagnosed in 2008 with CHF with EF <15%. He did everything in in his power including dieting, exercise, and strict compliance with his heart medications to improve his heart functioning. He was successful as by 2011 his EF had improved to 30-35% and by 12/2013, his EF was 40-45%. He was evaluated in the CHF Clinic at the Portland VA in 12/2013 and his CHF was determined to be stable on the medications he was taking to include digoxin. Therefore, it was clearly felt by the CHF Clinic VA health care providers that the digoxin was necessary for Mr. Burt as the medication was continued in 12/2013 with the note documenting, "**He is stable on good medical therapy**...**Continue medications as above**." ***See*** **Exhibit 1, Cardiology Outpatient Note 12/12/2013.** At that time, Mr. Burt was doing so well that he was discharged from the Portland VA CHF Clinic.

Dr. Reddy, an internal medicine primary care physician, was not a cardiologist or heart specialist and therefore, was negligent for discontinuing one of Mr. Burt's heart medications he was taking for CHF that had kept him stable for years without first evaluating Mr. Burt's current heart function by obtaining a Cardiology Consult and/or cardiac testing such as an ECHO. Mr. Burt had not had an ECHO since 12/2013 and with a previous history of an ECHO showing EF<15%, before discontinuing a heart medication, additional cardiac testing would have been performed by a prudent physician. Dr. Reddy documented in his note that he was unsure why Mr. Burt was on digoxin yet he failed to order cardiac testing to clarify the role of digoxin or obtain a cardiac specialists opinion.

The other heart medications Mr. Burt was taking included carvedilol which is a beta-blocker that reduces the workload on the heart as well as Lisinopril which works by blocking a specific enzyme in the body (angiotensin-converting enzyme) and causes the blood vessels to relax lowering blood pressure. Digoxin increases the strength of the heart muscle contraction and allows for more effective heart functioning. Studies have shown carvedilol and digoxin together are more effective then each one alone. Therefore, all these medications have varying effects on

the heart and had keep Mr. Burt's CHF stable for the approximately 10 years that he had been taking all three of these medications. His heart had become accustomed to the three medications and was functioning well. Proven beneficial clinical effects of digitalis therapy for heart failure include: Clinical improvement(6,7,9,12,13,15–17,21,22) including Symptoms, NYHA functional class, and HF score; Increases exercise capacity including Exercise time(5,6,12,16,17) and Total body O2 consumption on exercise; Decreases frequency of Clinical decompensation (worsening of heart failure)(5,7–15,21,22,25), Hospitalization for HF(12,21,22,25), and Deaths attributable to worsening HF(25); Reduces costs of treatment of HF(23); Increases LVEF(12,13,17,20–22); Reduction of LV dimensions(13,19); Improves hemodynamics at rest and on exercise -Reduces LV filling pressure and mean pulmonary artery wedge pressure, Increases CO, and Reduces ventricular rate; Reduces elevated neurohormones(5,6); Improves renal function-reduction of BUN and creatinine(21) and increased creatinine clearance." ***See* Exhibit 12, Shahbudin H. Rahimtoola, MB, FRCP, DSc, *Digitalis Therapy for Patients in Clinical Heart Failure*; Circulation. 2004;109:2942-2946.** The digoxin was providing Mr. Burt numerous benefits for his heart. The American College of Cardiology/American Heart Association recommends, "**All patients with clinical HF (that is, those in NYHA functional classes II-IV)** and **LV systolic dysfunction** should **receive digitalis**, unless contraindicated." ***Id.*** Mr. Burt had a diagnosis of CHF III, with improved but still decreased EF of 40-45% and LV systolic dysfunction with "moderately reduced LV systolic function" on his last ECHO from 2013. ***See* Exhibit 1, Cardiology Outpatient Note 12/12/2013.** To discontinue digoxin without an evaluation of Mr. Burt's heart functioning through Cardiology Consult and cardiac testing was a clear breach in the standard of care as Dr. Reddy was not qualified to make that decision especially with Mr. Burt's last cardiac test, an ECHO, had been performed nearly 4 years previously. Mr. Burt's heart function gradually but steadily declined off the digoxin. He began developing symptoms of CHF and he was in acute CHF within 10 months of discontinuing the digoxin after approximately 10 YEARS of stability of his heart functioning on digoxin. Based on the facts and timing of Mr. Burt's acute CHF, more likely than not, the discontinuation of the digoxin lead to progressive heart dysfunction for Mr. Burt and the acute CHF with EF of 15%.

Mr. Burt was enjoying retirement, traveling around with his dog, staying in RV Parks, going to the beach, and spending time camping out prior to the acute exacerbation of his CHF with EF down to 15% that occurred after the digoxin was discontinued. He now has to remain in a Motel 6 close to the VA Hospital for fear of developing complete heart failure and needing urgent care. He is suffering from depression and erectile dysfunction, which he first experienced in 2008 but had resolved with improvement in his heart function. Erectile dysfunction occurs with heart problems because inadequate blood supply to the heart also affects blood flow to the penis. Tragically, Mr. Burt is now in a worse situation with his heart condition than he was in 2008 when he had worked so hard to improve his heart disease. In 2008, his hard work paid off

as he was successful in effectively managing his CHF for nearly 10 years with EF of 40-45% by 2013. That all changed when the digoxin that was strengthening the contractility and function of his heart and which his heart had become accustomed to was suddenly discontinued in 7/2017 without ANY cardiac testing or evaluation by a cardiac specialist. Mr. Burt has been forced to start the fight over again to improve his heart functioning. However, this time, the damage may be too significant and he may require an implantable defibrillator or even a heart transplant. Mr. Burt is only 57 years old.

**#10 STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM:**

As a result of the negligence of United States employee health care providers, Arnold Kevin Burt has sustained damages and injuries including, but not limited to:

1. Past and future physical pain, suffering, and mental anguish;
2. Past and future medical, health and attendant care;
3. Past and future heart dysfunction/failure;
4. Past and future loss of household services;
5. Past and future diminished enjoyment in life;
6. Past and future out of pocket expenses; and
7. Other pecuniary damages.

In addition, Arnold Kevin Burt seeks recovery of all other damages to which he is entitled pursuant to the applicable state and federal law(s).

**#11 WITNESSES**

For the identity of witnesses to the incidents described in this claim and persons with knowledge of relevant facts, please refer to the medical and billing records from U.S. Government facilities and health care providers which set forth the identity of health care providers, record custodians, other personnel, and lay persons who are witnesses or potential witnesses in this case. Further, claimants herein are identified as witnesses. Additional witnesses may be known as future discovery is obtained.